**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

━━━━━━━━━━━━━━━━━━━━━━━━━━━

CHARLES J. SMITH,

                              Plaintiff,

          v.

BRIAN SULLIVAN, et al.,                    No. 9:20-CV-659
                                           (DNH/CFH)

                              Defendants.

━━━━━━━━━━━━━━━━━━━━━━━━━━━

**APPEARANCES:**                    **OF COUNSEL:**

Charles J. Smith
96-A-6765
Gouverneur Correctional Facility
Scotch Settlement Road
P.O. Box 480
Gouverneur, New York 13642
Plaintiff pro se

Attorney General for the          LYNN MARIE KNAPP, ESQ.
State of New York                 STACEY A. HAMILTON, ESQ.
The Capitol                       Assistant Attorneys General
Albany, New York 12224
Attorneys for defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

          Plaintiff pro se Charles J. Smith ("plaintiff"), who was at all relevant times in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants

_____

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Tier III Disciplinary Hearing Officer Lieutenant ("Lt.") Brian Sullivan ("Sullivan") and Sergeant ("Sgt.") Barkman ("Barkman") (collectively, where appropriate, "defendants"), violated his constitutional rights under the First, Eighth, and Fourteenth Amendments, as well under New York State law.  See Dkt. No. 50 ("Sec. Am. Compl.").[2]  Presently before the Court are defendants' motion for summary judgment brought pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56, see Dkt. No. 119; plaintiff's motion for summary judgment, see Dkt. No. 124; plaintiff's and defendants' responses in opposition to the other party's motion, see Dkt. Nos. 125, 129; and both parties' statements of material facts, see Dkt. Nos. 126, 134.  Plaintiff also filed a response to defendants' statement of material facts.  See Dkt. No. 135.  For the reasons that follow, it is recommended that defendants' motion be granted, plaintiff's motion be denied, and plaintiff's second amended complaint be dismissed in its entirety.

## I.  Procedural Issues

### A.  Defendant Patrick Mahar

In his second amended complaint, plaintiff named Correctional Officer ("C.O.") Patrick Mahar ("Mahar") as a defendant.  See Sec. Am. Compl. at 3, 10-11.[3]  Mahar died on October 9, 2021, and defendants filed a Statement Noting Death pursuant to Federal Rule of Civil Procedure 25 on March 25, 2022.  See Dkt. No. 65; see also Dkt.

---

[2] Plaintiff initially sought to bring this action against numerous other individuals.  See Dkt. No. 1. Following the Court's initial review of plaintiff's complaint, the review of his amended complaint, and a ruling on his motion to amend his amended complaint, the Court dismissed a number of claims and defendants.  See Dkt. Nos. 4, 8, 9, 38, 49.  The operative complaint is plaintiff's second amended complaint.  See Dkt. No. 50.

[3] Citations to the record are to the pagination generated at the top of each page by CM/ECF.

No. 119-16 at 8.  Under Rule 25, "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party.  A motion for substitution may be made by any party or by the decedent's successor or representative."  Fed. R. Civ. P. 25(a)(1).  "If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed."  Id.

Far more than ninety days have passed since defendants filed the notice of Mahar's death and neither party moved to substitute another defendant.  See Dkt. No. 65.  Accordingly, it is recommended that the claims against defendant Mahar be dismissed.  See Baron v. Miller, No. 3:13-CV-153 (FJS/DEP), 2015 WL 1788945, at *3 (N.D.N.Y. Apr. 20, 2015) ("[M]ore than ninety days have elapsed since the filing of notice of [the] defendant['s] [] death.  During that time neither [the] plaintiff nor any other party has moved to substitute another representative of [the] defendant [] and/or the estate of [another] defendant [].  Accordingly, [the] plaintiff's claims against [the] defendant [] . . . are subject to dismissal.").[4]

### B.  Plaintiff's Memoranda of Law

#### 1.  Local Rule 7.1

Plaintiff's memorandum of law filed in support of his motion for summary judgment is sixty pages.[5]  See Dkt. No. 124-1.  His memorandum of law filed in support of his opposition to defendants' motion for summary judgment is twenty-eight pages.  See Dkt. No. 125-1.

---

[4] Generally, all unpublished decisions cited in this Report-Recommendation and Order are provided to plaintiff.  However, in light of the number of unpublished cases that have been cited, the Court will not provide plaintiff with copies of cases that adopt cited Report-Recommendations and Orders.

[5] This includes a cover page, table of contents, table of authorities, and "preliminary statement."  See Dkt. No. 124-1 at 1-9.  Plaintiff's tables of contents and authorities and "preliminary statement" are included twice.  See id. at 10-17.

Local Rule 7.1 requires that a memorandum of law not exceed twenty-five, double-spaced pages "unless that party obtains leave of the judge hearing the motion prior to filing."  L.R. 7.1(b)(1).  Plaintiff did not seek permission from the Court to exceed the twenty-five-page limit.

"It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," because "a *pro se* litigant generally lacks both legal training and experience, and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection."  Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010).  However, a litigant's pro se status does not excuse non-compliance with the Local Rules.  See Faretta v. California, 422 U.S. 806, 834, n.46 (1975) ("The right of self-representation is not a license . . . not to comply with relevant rules of procedural and substantive law."); Caidor v. Onondaga County, 517 F.3d 601, 605 (2d Cir. 2008) (citations omitted) ("We recognize that the right to appear *pro se* 'should not be impaired by harsh application of technical rules,' and therefore we 'make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'  Nonetheless, '*pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.'").

This Court is often reluctant to strike a pro se litigant's memorandum of law that exceeds the Local Rules' mandate in light of special solicitude.  See Avent v. Platinum Plus Auto Prot., No. 1:19-CV-1494 (BKS/DJS), 2021 WL 706643, at *4 (N.D.N.Y. Feb. 23, 2021) ("[O]ut of solicitude to his *pro se* status the Court will, on this occasion, consider [the p]laintiff's [forty-one-page] brief in its entirety."); Sidney v. Caron, No. 9:09-CV-1326 (GTS/ATB), 2012 WL 4380392, at *2, n.2 (N.D.N.Y. Sept. 25, 2012)

4

(considering entirety of thirty-five-page memorandum of law); <u>Solomon v. Hum. Servs. Coal. of Tompkins Cnty. Inc.</u>, No. 5:11-CV-226 (GTS/ATB), 2012 WL 3996875, at *3, n.2 (N.D.N.Y. Sept. 11, 2012)  ("Although [the p]laintiff's opposition memorandum of law blatantly violates the Court's 25–page limit on such memoranda (which [the p]laintiff had previously been advised through her receipt of a courtesy copy of the District's *Pro Se* Handbook and Local Rules of Practice), the Court will ignore that violation, out of an extension of special solicitude to her as a *pro se* civil rights litigant.").

Here, given plaintiff's <u>pro</u> <u>se</u> status and because defendants were afforded the opportunity to respond to plaintiff's motion for summary judgment, the Court will consider the excess pages from plaintiff's memoranda of law.  <u>See</u> Dkt. Nos. 124-1, 125-1; <u>see</u> <u>also</u> <u>Catz v. Precision Glob. Consulting</u>, No. 19-CV-7499 (ER), 2021 WL 1600097, at *4 (S.D.N.Y. Apr. 23, 2021) (collecting cases) ("While it is within the Court's discretion to strike memoranda for failing to abide by the Court's Individual Practices, courts throughout the Second Circuit have typically exercised such discretion only when the opposing party is prejudiced by the violation or did not have the opportunity to respond in its own memorandum.").  However, plaintiff is cautioned that regardless of his <u>pro</u> <u>se</u> status, he must comply with the Local Rules in the future.

### 2.  Raising New Claims

Defendants argue that in plaintiff's motion for summary judgment, he raises claims that were not asserted in his second amended complaint.  <u>See</u> Dkt. No. 129 at 5. Specifically, defendants assert that plaintiff raises the following claims in his motion which are not before the Court: due process claims; a malicious prosecution claim; a cruel and unusual punishment claim; and a sufficiency of the evidence claim.  <u>See</u> <u>id.</u> at 5-7 (citations omitted).

In his statement of material facts,[6] plaintiff contends, "[t]here is no mention –

according to Dkt. 49 – that indicates that the Court reviewed the Second Amended

Complaint (if at all) and found/decided that" only certain claims remained.  Dkt. No. 134

at 4, ¶ 11.  In his "Opposition to Def.'s Statements of Material Facts" plaintiff states that

his "Second Amended Complaint was not yet reviewed nor decided as to what claims

survived."  Dkt. No. 135 at 1.  Specifically, plaintiff notes that "[i]n 2nd amended

complaint there exist[s] a claim against Def. Barkman (see page A7 of that complaint)

for 8th Amendment violations (and 'supervisory liability') that does not appear in prior

(the 1st) amended nor original complaint . . . ."  Id.

"'[I]t is black letter law that a party may not raise new claims for the first time in

opposition to summary judgment' and this principle applies to cross-motions for

summary judgment as well[.]"  Zdziebloski v. Town of E. Greenbush, No. 1:15-CV-0298

(LEK/CFH), 2017 WL 1968672, at *9 (N.D.N.Y. May 11, 2017) (additional citation

omitted) (quoting Brandon v. City of New York, 705 F. Supp. 2d 261, 278 (S.D.N.Y.

2010)); see also Valentine Properties Assocs., LP v. U.S. Dep't of Hous. & Urb. Dev.,

785 F. Supp. 2d 357, 372 (S.D.N.Y. 2011) (collecting cases to support the contention

that it "is impermissible[]" for claims to be "raised for the first time in [a p]laintiffs' motion

papers."), aff'd, 501 F. App'x 16 (2d Cir. 2012) (summary order); Murray v. Palmer, No.

9:03-CV-1010 (DNH/GLS), 2008 WL 2522324, at *22 (N.D.N.Y. June 20, 2008) ("[A] *pro

se* plaintiff's papers in opposition to a *motion for summary judgment* may not be [] read

---

[6] Plaintiff submitted two statements of materials facts.  Plaintiff first attached to his motion for summary judgment a statement of material fact pursuant to "Local Rule 7.1."  Dkt. No. 124 at 1.  The relevant Local Rule for a statement of material facts is Local Rule 56.1, which was formerly Local Rule 7.1(a)(3).  See L.R. 56.1. After defendants filed their statement of material facts, see Dkt. No. 126-1, the Court granted plaintiff twenty days to respond.  See Dkt. No. 128.  Plaintiff also then sought and received permission from the Court to file a statement of material facts.  See Dkt. Nos. 132, 133.

[to effectively amend the pleading], in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.").

Similarly, when a court has previously dismissed certain claims, courts will not then consider those claims at the summary judgment stage.  See Heyliger v. Trombley, No. 9:14-CV-00603 (TJM/TWD), 2016 WL 11480156, at *10 (N.D.N.Y. June 9, 2016) ("Inasmuch as [the p]laintiff's 'First Amendment right to free speech' and 'substantive due process claims' were previously dismissed . . . upon initial review, the Court recommends denying [the p]laintiff's motion for summary judgment as to these claims."), report and recommendation adopted, 2016 WL 4029346 (N.D.N.Y. July 27, 2016); Hosp. Auth. of Rockdale Cnty. v. GS Cap. Partners V Fund, L.P., No. 09-CV-8716 (PAC), 2013 WL 840851, at *8 (S.D.N.Y. Mar. 6, 2013) (noting that the defendant cannot reassert previously dismissed arguments in light of information learned through discovery because "[d]iscovery cannot change the prior determinations . . . ."); Jones v. Vill. of Bath Police Dep't, No. 08-CV-00517 (RJA/JJM), 2011 WL 4748342, at *1, n.2 (W.D.N.Y. Sept. 15, 2011) ("[The p]laintiff also alleges unspecified violations of the Americans with Disabilities Act, but these claims were previously dismissed . . . [.]"), report and recommendation adopted, 2011 WL 4748297 (W.D.N.Y. Oct. 5, 2011).

Finally, although "'[i]t is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect,' '[i]n rare circumstances, courts in the Second Circuit will consider prior pleading[.]'  A court will do so only 'when the plaintiff directly contradicts the facts set forth in his original complaint.'"  Diaz v. Loc. No. 241, Transp. Workers Union of Am., Univ. Div., No. 17-CV-8898, 2019 WL 3765924, at

*2 (S.D.N.Y. Aug. 9, 2019) (alterations in original) (quoting Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977); 2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co., 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015)).  "Thus, '[w]here . . . an amended pleading is not in 'direct' contradiction with the original pleading, courts apply the general rule recognizing that an amended pleading completely replaces the original pleading.'" Id. (citation omitted); see also Brooks v. 1st Precinct Police Dep't, No. 11-CV-6070 (MKB), 2014 WL 1875037, at *3 (E.D.N.Y. May 9, 2014).

Plaintiff filed his original complaint on June 12, 2020.  See Dkt. No. 1.  After reviewing the complaint under 28 U.S.C. § 1915A, the Court permitted certain claims to proceed and dismissed others with and without prejudice.  See Dkt. No. 4 at 29.  The Court instructed plaintiff that should he wish to pursue any of the claims dismissed without prejudice, an amended complaint would "supersede and replace the original complaint in its entirety[.]" Id. at 30, n.15.  Plaintiff then filed an amended complaint on August 17, 2020.  See Dkt. No. 8.  The Court reviewed the amended complaint and permitted specific claims to proceed and dismissed others without prejudice.  Dkt. No. 9 at 19-20.  Defendants answered the amended complaint.  See Dkt. No. 27.

On July 14, 2021, plaintiff moved to "supplement" his amended complaint.  Dkt. No. 33.  The Court instructed plaintiff that he must file a formal motion to amend.  See Text Order 07/20/2021.  The Court entered a Text Order, which was sent to plaintiff via regular mail, and which denied plaintiff's motion to supplement and stated that his "proposed amended pleading must be a complete pleading, which will supersede the original pleading in all respect.  Plaintiff's proposed amended pleading shall not incorporate by reference any portion of any prior pleading."  Dkt. No. 35 (citation

omitted); <u>see</u> L.R. 15.1(a).  On August 30, 2021, plaintiff moved to amend his amended

complaint.  <u>See</u> Dkt. No. 38.  Plaintiff attached his proposed second amended

complaint.  <u>See</u> Dkt. No. 38-1.  In his motion, plaintiff asked that his proposed second

amended complaint "be also supplemental pleading therein the Amended Complaint.

And if not, then it's to remain as an Amended Complaint over my opposition as to what

it should be constituted as."  Dkt. No. 38 at 5, ¶ 7.

On December 9, 2021, the Court granted in part and denied in part plaintiff's

motion to amend.  <u>See</u> Dkt. No. 49.  The Court reviewed plaintiff's proposed second

amended complaint and stated that it was "materially similar to the amended complaint,

with a few exceptions."  <u>Id.</u> at 6.  The Court explained that in his second amended

complaint, plaintiff sought to name additional defendants—DOCCS Commissioner

Anthony Annucci and Superintendent of Greene Correctional Facility ("Greene C.F.")

Smith; he no longer named "Counselor Yannone or the official identified in the amended

complaint as 'John Doe'" as defendants; and he clarified the spelling of defendant

Barkman's name.  <u>Id.</u> at 6-7.  The Court stated that

> the proposed second amended complaint re-asserts the following claims
> for relief that survived the Court's review of the amended complaint in
> accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b): (1)
> First Amendment retaliation claims against defendants Barkman (formerly
> "Parkman") and Mahar; (2) an Eighth Amendment failure-to-protect claim
> against defendant Mahar, and a related state law tort claim; (3) an Eighth
> Amendment conditions-of-confinement claims against defendant Sullivan,
> and a related state law tort claim; and (4) Fourteenth Amendment equal
> protection claims against defendants Barkman and Sullivan.

<u>Id.</u> at 11-12.  The Court granted plaintiff's motion "insofar as plaintiff seeks to re-assert

the aforementioned claims (and clarify the spelling of one of the named defendants)."

<u>Id.</u> at 12.  The Court then denied plaintiff's motion "insofar as plaintiff seeks to assert an

Eighth Amendment conditions-of-confinement claim against defendant Barkman[,]"

DOCCS Commissioner Annucci, and Greene C.F. Superintendent Smith.  Id. at 14-15.

The Court informed plaintiff that his second amended complaint "supersede[d] and

replace[d] the previously filed amended complaint and will be the operative pleading."

Id. at 16.  The Court separately docketed plaintiff's second amendment complaint and

defendants answered the second amended complaint.  See Sec. Am. Compl.; Dkt. No.

53.

Based on the foregoing, plaintiff's contention that the Court did not review his

second amended complaint and state which claims survived, is incorrect.  See Dkt. No.

134 at 4, ¶ 11; Dkt. No. 135 at 1.  The Court explicitly stated which claims were

reasserted in plaintiff's second amended complaint and survived review, denied

plaintiff's request to add other claims, and informed him that the second amended

complained replaced the previously filed complaints.  See Dkt. No. 49 at 11-16.

Plaintiff's motion for summary judgment, statements of material facts, and

responses, focus largely on alleged due process violations.  See Dkt. No. 124-1 at 19-

24, 27-34, 42-45; Dkt. No. 125-1 at 7, Dkt. No. 125-2 at 1.  In his first amended

complaint, plaintiff asserted a due process claim, alleging that a disciplinary hearing was

held after the statutorily allowed time and that he was held in the Special Housing Unit

("SHU") without a hearing.  See Dkt. No. 8 at 7-8.  The Court, in reviewing plaintiff's first

amended complaint, noted that he raised due process claims, but dismissed those

claims for failure to state a claim upon which relief could be granted.  See Dkt. No. 9 at

7, 9, 10, 14.  Plaintiff did not reallege the due process allegations in his second

amended complaint.  See generally Sec. Am. Compl.  To be sure, in his second

amended complaint, plaintiff mentioned a "[d]enial of due process" and that Sullivan "refused to hear [his] re[a]soning" at a disciplinary hearing. Id. at 3, 14. However, the Court did not conclude that this was sufficient to assert a due process claim. Rather, the Court interpreted plaintiff's second amended complaint to raise only certain claims, none of which were a due process claim. See Dkt. No. 49 at 12. Likewise, plaintiff argues that he included an Eighth Amendment claim against defendant Barkman in his second amended complaint. See Dkt. No. 135 at 1. The undersigned agrees that plaintiff raised an Eighth Amendment conditions of confinement claim against Barkman in his second amended complaint. See Sec. Am. Compl. at 12. However, the Court explicitly reviewed that claim and denied plaintiff's motion to amend. See Dkt. No. 49 at 13-14. Plaintiff did not appeal or otherwise contest the Court's decision.

As plaintiff was informed numerous times that an amended complaint would supersede all previously filed complaints, his second amended complaint does not in any way contradict his original or first amended complaint, and he did not challenge or seek reconsideration of the Court's decision on his motion to amend, the Court will not consider claims that the Court previously dismissed or denied amendment, or that were not previously raised. See Heyliger, 2016 WL 11480156, at *10; Diaz, 2019 WL 3765924, at *2; Zdziebloski, WL 1968672, at *9. The undersigned will address only those claims that survived this Court's review and that relate to the two remaining defendants: (1) a First Amendment retaliation claim against Barkman; (2) an Eighth Amendment conditions of confinement claim against Sullivan, and a related state law tort claim; and (3) Fourteenth Amendment Equal Protection claims against Barkman and Sullivan. See Sec. Am. Compl.; Dkt. No. 49. Thus, it is recommended that

11

plaintiff's motion for summary judgment be denied on all claims which are not properly before the Court.


## II. Summary Judgment Standard

"[T]he Court must construe the evidence in the light most favorable to the non-moving party, and may grant summary judgment only where 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Hicks v. Craw, 405 F. Supp. 3d 374, 380 (N.D.N.Y. 2019) (citing Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999); quoting FED. R. CIV. P. 56(a)). "Material facts are those that 'might affect the outcome of the suit under the governing law.' An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).

The moving party has the burden of showing the absence of a genuine dispute of material fact by citing to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (citation omitted); see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court . . . must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)); see also Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted) (alteration in original) ("[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.").

Where a party seeks judgment against a pro se litigant, or a pro se litigant moves for summary judgment, the Court must afford the pro se litigant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (per curiam). As the Second Circuit explained,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," that a *pro se* litigant's submissions must be construed "liberally," and that such submissions must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, or arguments that the submissions themselves do not "suggest," that we should not "excuse frivolous or vexatious filings by *pro se* litigants," and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law[]" . . . .

Id. (citations omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) (citations and quotation marks omitted) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally.").

"The same standard[s] apply" when both parties have moved for summary judgment.  See Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)).  "[E]ven when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." Id. (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)).  "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration" Id. (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

### III.  Factual Background

### A.  Undisputed Facts

On March 26, 2020, a DOCCS memorandum was issued from the Deputy Commissioner for Correctional Facilities to "All Superintendents."  Dkt. No. 119-3; see also Dkt. No. 124-2 at 4.  The memorandum stated,

> [i]n an effort to mitigate the spread of COVID-19, we previously provided direction to the HUB Superintendents to minimize or eliminate, where possible, double bunking in the medium security facilities.  As we continue to mitigate the spread of this virus, double-cell housing will be limited where possible, contingent upon space availability.  All internal facility moves, including within the same housing unit, are suspended absent

14

exigent circumstances or upon the completion of a disciplinary
confinement sanction.

Dkt. No. 119-3; see also Dkt. No. 124-2 at 4. Another memorandum was issued on

June 30, 2020, which stated, "[t]his is a follow up to the NY FORWARD memorandum

dated, May 28, 2020[,] which calls for the gradual resuming of internal movement and,

also supersedes the memorandum dates, March 26, 2020[,] which suspended internal

moves." Dkt. No. 119-4. The June memorandum instructed that "[a]lthough we are

gradually resuming internal movement, the use of double bunked cells in medium

security facilities should remain limited, to the extent possible." Id.

While housed in the D-1 general population dorm at Greene C.F. on April 12,

2020, plaintiff and another inmate were involved in a fight. See Dkt. No. 126-1 at 1-2,

¶¶ 1, 10; see also Dkt. No. 134 at 2-3, ¶¶ 1, 4. Following the altercation, plaintiff and

the other inmate were separated into two different rooms. See Dkt. No. 126-1 at 2,

¶ 11; Dkt. No. 119-2 at 39-41, 43-45. Plaintiff was escorted by a female officer into the

"I.D. process room." Dkt. No. 124 at 17, ¶ 17; Dkt. No. 119-2 at 43. Plaintiff was then

taken to the infirmary. See Dkt. No. 126-1 at 2, ¶ 12; Dkt. No. 119-6; Dkt. No. 119-2 at

45. Defendant Barkman did not take plaintiff to the infirmary or see his injury report.

See Dkt. No. 119-5 at 2-3, ¶¶ 10, 12; Dkt. No. 119-2 at 45-52. Plaintiff requested

Tylenol for a severe headache following the fight, but the nurse indicated that he

"denies injuries. No injuries noted." Dkt. No. 119-6. After returning from the infirmary,

defendant Barkman told plaintiff, "we're SHU-ing you. We're putting you in the SHU."

Dkt. No. 119-2 at 53. Barkman did not say anything to plaintiff while he transferred

plaintiff to the SHU. See id.; see also 126-1 at 4, ¶ 26; Dkt. No. 134 at 4-5, ¶¶ 12, 14.

C.O. Mahar wrote a misbehavior report against plaintiff for the fight, which stated that he observed plaintiff "striking [another] inmate in the head and body with closed fists. [Plaintiff] was the aggressor in the altercation. [He] gave a verbal order to break it up to which both inmates complied + separated. The area supervisor and response team arrived and escorted the inmates off the unit . . . ." Dkt. No. 119-7; see also Dkt. No. 126-1 at 3, ¶ 14. Plaintiff was "moved at another housing unit," as authorized by Lt. Mahoney. Dkt. No. 119-7. Sgt. P. Csorba authored a memorandum to Lt. Mahoney which reiterated C.O. Mahar's account of the fight, noted that plaintiff was the aggressor, and stated that he, Sgt. Csorba, "was notified, responded with staff, and escorted both inmates off unit with no further incident. [The other inmate] stated that [plaintiff] hit him for no reason, and they began fighting. [Plaintiff] was uncooperative with questioning." Dkt. No. 119-8; see also Dkt. No. 126-1 at 3, ¶ 15. A disciplinary hearing was held concerning the misbehavior report and plaintiff pleaded guilty. See Dkt. No. 126-1 at 3, ¶ 16; Dkt. No. 134 at 5, ¶ 15; Dkt. No. 119-9.

When he was transferred to the SHU on April 12, 2020, plaintiff was placed in a cell by himself. See Dkt. No. 124 at 18-19, ¶ 18; Dkt. No. 119-2 at 57. That same day, plaintiff was moved to a second cell by himself. See Dkt. No. 119-2 at 58. Plaintiff was then given a cell mate, but the cell mate was removed either "minutes" or "a few hours" later. Dkt. No. 124 at 21, ¶ 22; Dkt. No. 119-2 at 58-61.

On April 14, 2020, officers came to plaintiff's cell to inform him that he was getting a bunk mate, but "they said never mind and took [the other inmate] to another cell." Dkt. No. 124 at 22, ¶ 25; see also Dkt. No. 119-2 at 64. Plaintiff then wrote a grievance stating that his cell was not properly set up, complaining about being double

bunked, and asserting that he "must remain single celled" because it is impossible to social distance in the cell and because he was not being "matched up" properly with an inmate his same age and religious affiliation.  Dkt. No. 119-15 at 6; see also Dkt. No. 124-2 at 20.  A few days later, plaintiff was moved to a third cell by himself.  See Dkt. No. 119-2 at 66-68.

On April 23, 2020, Sgt. Faison interviewed plaintiff about his April 14, 2020, grievance.  See Dkt. No. 119-15 at 12.  During the interview, plaintiff "emphasized that he wanted to pursue the grievance more on the grounds of potentially being subjected to double bunking[.]"  Id.  Plaintiff "acknowledged that he ha[d] not been housed with another inmate as implied in the grievance and ha[d] been assigned to a cell alone since his arrival."  Id.  Sgt. Faison informed plaintiff that he had no intention of double bunking plaintiff, but that did not prevent another officer from doing so.  See Dkt. No. 124 at 23-24, ¶ 27; Dkt. No. 119-2 at 173-74.

On May 3, 2020, C.O. B. Joseph Robinson came to plaintiff's cell and informed him that he was being assigned a bunk mate.  See Dkt. No. 119-13; Dkt. No. 124-2 at 33.  Plaintiff testified in his deposition that he went to the recreation pen door to wait for it to be opened so he could step outside, as ordered, but that he told the officer he wanted to speak with a sergeant because he was not supposed to be double bunked.  See Dkt. No. 119-2 at 69-70.  The other inmate was not placed in plaintiff's cell.  See Dkt. No. 119-13.  C.O. Robinson authored a misbehavior report against plaintiff for refusing a double bunk assignment and a direct order, interfering with a correctional officer, and a movement violation.  See id.; see also Dkt. No. 126-1 at 5, ¶ 33; Dkt. No. 134 at 5, ¶ 16.  Plaintiff wrote a grievance on May 3, 2020, complaining that correctional

officers were trying to make him share a cell.  See Dkt. No. 119-15 at 7; Dkt. No. 124-2 at 29.

On May 7, 2020, the Inmate Grievance Resolution Committee responded to plaintiff's grievances concerning the double bunking and concluded that plaintiff "was single celled at the time of investigation.  There is no indication in this investigation that [plaintiff] would not be double bunked.  Double bunking is at the discretion of staff."  Dkt. No. 119-15 at 9; see also Dkt. No. 124-2 at 31.

On May 9, 2020, plaintiff was moved to a different cell.  See Dkt. No. 124 at 28, ¶ 33.  The officer that moved him stated, "[y]ou are moving to 49 cell to double bunk.  If you do not comply when I return to transfer you to that cell, I will issue a misbehavior report."  Id. see also Dkt. No. 119-2 at 74-75.  Plaintiff was given a face mask for the first time during this transfer, and he was instructed to wear it.  See Dkt. No. 119-2 at 158-59.  Once plaintiff was in the new cell, he realized there was another inmate already occupying the cell.  See id. at 73.

A disciplinary hearing was held before defendant Sullivan on May 13, 2020, concerning the May 3, 2020, misbehavior report.  See Dkt. No. 126-1 at 5, ¶ 32; Dkt. No. 134 at 6, ¶ 17; Dkt. No. 119-14; Dkt. No. 124-2 at 47; Dkt. No. 125-3 at 12-17. During the hearing, plaintiff pleaded not guilty to the charges and stated, "I saw a woman come to my gate and she began to say something, and I began to speak to her and she walked off.  I said what is this a set up or something, looks like a set up.  And she just walked off and wasn't even listening to me."  Dkt. No. 119-14 at 3.  Plaintiff continued, "[s]o, I said alright just walk back in and sat down and Ahh, continued on what I was doing."  Id.  Sullivan asked plaintiff if he understood "that this is a double cell

18

facility" and plaintiff affirmed his understanding.  Id.  Plaintiff explained that he was "double bunking right now with somebody."  Id.  Sullivan responded, "[y]eah, well what went on after this incident matters none to me, this incident is what matters to me.  That is what I need to resolve."  Id.  Plaintiff then reiterated his position that he was listening to the correction officer when she came to his cell and he "began to say something back to her, but she walks off and says I refuse."  Id.  Plaintiff was found guilty of refusing a direct order, a movement regulation violation, and of refusing double celling.  See Dkt. No. 126-1 at 5, ¶ 37; Dkt. No. 134 at 6, ¶ 20; Dkt. No. 119-14 at 5; Dkt. No. 124-2 at 43-45.

During plaintiff's incarceration in the SHU, neither defendant Barkman nor Sullivan made the decision as to what cell plaintiff was going to be housed in, or whether he would have a cell mate.  See Dkt. No. 119-5 at 3-5, ¶¶ 12, 15-16, 21; Dkt. No. 119-12 at 2-3, ¶¶ 4, 7, 9.  Plaintiff was moved back into the general population during the last week of May 2020.  See Dkt. No. 124 at 30, ¶ 37.  Plaintiff's bunk mate left the cell "about four days before" plaintiff.  Dkt. No. 119-2 at 77.

On May 14, 2020, plaintiff appealed the denial of grievances to the superintendent and the superintendent denied the appeal.  See Dkt. No. 119-15 at 9-10. The Superintendent wrote his decision on May 28, 2020, and indicated that plaintiff "has since been released from keep lock and returned to [general population].  Therefore, the issue is now moot."  Id. at 10.  Plaintiff appealed to the Central Office Review Committee ("CORC") and CORC denied the appeal.  See id. at 1, 10; see also Dkt. No. 124-2 at 75.  CORC explained, in part, "that no incarcerated individual has the right to a

specific housing location and [] that the grievance program is not intended to support an adversary process."  Dkt. No. 119-15 at 1.

Plaintiff was placed into quarantine on January 20, 2021, after being exposed to an individual who tested positive for COVID-19.  See Dkt. No. 124-2 at 50, 52, 54; see also Dkt. No. 119-2 at 143-44.  Plaintiff tested negative at that time.  See Dkt. No. 124-2 at 54.  Plaintiff tested positive for Tuberculosis in June 2021.  See id. at 55-57; see also Dkt. No. 119-2 at 147. Plaintiff tested positive for COVID-19 on January 5, 2022.  See Dkt. No. 124-2 at 71; see also Dkt. No. 119-2 at 143, 148.

### B.  Disputed Facts

Defendant Barkman declares that following the April 12, 2020, fight between plaintiff and another inmate he "did not order that the two inmates be brought to separate holding rooms in the inmate identification office[]" and he never discussed the fight with plaintiff.  Dkt. No. 119-5 at 2, ¶¶ 6, 8.  He declares that "[t]he only involvement [he] had with [] plaintiff on April 12, 2020, was escorting him from general population to the SHU, after his fight with another inmate, at the direction of Lt. Mahoney who was the Watch Commander on duty at the time."  Id. at 4-5, ¶ 19.

In plaintiff's affidavit submitted in support of his motion for summary judgment, he attests that following the fight, when he was in the identification room, a sergeant came to speak with him and he "recognized this sergeant as Def. Barkman[.]"  Dkt. No. 124 at 17, ¶ 17.  Plaintiff states that Barkman asked plaintiff what happened, left to speak to the other inmate, returned, and told plaintiff that the fight was a misunderstanding, and they were going to separate him and the other inmate into separate dorms.  See id. at 17-18, ¶ 17.

Defendant Sullivan declares that when plaintiff was brought to the May 13, 2020, disciplinary hearing he "did not know what cell [plaintiff] was occupying[.]"  Dkt. No. 119-12 at 2, ¶ 5.  He also declares that following his ruling on the hearing, he "had no involvement in any decision related to what cell [] plaintiff was brought to after the hearing."  Id. at 3, ¶ 7.

In his response to defendants' statement of material facts, plaintiff contends that before Sullivan began a disciplinary hearing, he had to "'personally' obtain the informed whereabouts to what location inmate is locked so that he himself can know where to go to conduct hearing and what cell . . . he is to give to escort officers to bring inmate before him to have hearing done[.]"  Dkt. No. 135 at 2.  Plaintiff states that "[t]he inmate's confinement location cell number is on the paperwork [Sullivan] must tote with him . . . to the hearing."  Id. at 2-3.

## IV.  Analysis

### A.  Personal Involvement

Defendants declare that they had no personal involvement in the decisions to place plaintiff in the SHU or in a cell with another inmate.  See Dkt. No. 119-5 at 3-5, ¶¶ 15, 19, 21; Dkt. No. 119-12 at 2-3, ¶¶ 4, 8-9.  Plaintiff does not dispute that neither defendant made those decisions.  Plaintiff submits a "Declaration in Support of Opposition to Def.s request for summary judgment order" which is signed and written "under penalty of perjury[.]"  Dkt. No. 125-3 at 1, 10.  In this declaration, plaintiff states that his claims do not involve "a specific decision made by other officers, but instead . . . concern[] conduct specifically relating to Sullivan and Barkman duties and powers as []

officers to sufficiently perform [their] duties and to intervene on/in matters of wrong-doings by other staff . . . ." Id. at 8-9, ¶ 15.  In his memorandum of law in support of his opposition, plaintiff states

> it matters less or at all, as to whether defendant Barkman and or Sullivan were involved with a certain decision to SHU plaintiff.  For that is not my claim nor argument.  But instead my claim/argument is that both Barkman and Sullivan are supervisory officials who has supervising powers over the SHU, chose to not intervene – per interdepartmental memo/instructions/executive orders to remedy such double bunking once they did in fact (and upon making SHU ROUNDS) become aware that inmates – such as Smith – were being subject to double bunking.

Dkt. No. 125-1 at 12.  In plaintiff's motion for summary judgment, he asserts that "[n]owhere in all of the entirety of the discovery given me by [d]efendants and their attorney does it reveal[] who it was that had me moved to, and or ordered me placed in SHU 49B with another bunky/inmate."  Dkt. No. 124-1 at 57.  He states, "although there may be some implication . . . that is may have been Sgt. Faison who ordered me moved in with another inmate . . ., it just can not be determined at this point due to [d]efendant's manipulative discovery and concealing of information."  Id.

In their motion for summary judgment and in the context of discussing the merits of each of plaintiff's claims, defendants reiterate that they had no personal involvement in deciding where plaintiff was housed.  See Dkt. No. 119-16 at 11, 14, 17, 21.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  "Thus, a [§] 1983 plaintiff must allege a tangible connection between the acts of the defendant and the injuries suffered."  Burroughs v. Petrone, 138 F. Supp. 3d 182, 220 (N.D.N.Y. 2015) (citations and quotation marks omitted).

In his motion for summary judgment, plaintiff cites Colon v. Coughlin, which "set forth five theories of liability that could apply to supervisory officials." Morrow v. Vanderwerff, No. 9:19-CV-555 (DNH/DJS), 2022 WL 526218, at *3 (N.D.N.Y. Jan. 6, 2022) (citing Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995)), report and recommendation adopted, 2022 WL 523745 (N.D.N.Y. Feb. 22, 2022); see also Dkt. No. 124-1 at 56.  However, in Ashcroft v. Iqbal, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  556 U.S. 662, 676 (2009); see also Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020).  This holding "engendered conflict within [the Second] Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*."  Reynolds v. Barrett, 685 F.3d 193, 205, n.14 (2d Cir. 2012) (citation omitted).  In resolving this conflict, "the Second Circuit has instructed that a "[p]laintiff allege and establish that [] [d]efendants violated his rights 'by [their] own conduct, not by reason of [their] supervision of others who committed the violation.'" Morrow, 2022 WL 526218, at *3 (quoting Tangretti, 983 F.3d at 619).  "For supervisory [d]efendants, a mere linkage to the unlawful conduct through the prison chain of command . . . is insufficient to show his or her personal involvement in that unlawful conduct."  Id. (citation and quotation marks omitted).  "The alleged failure to remedy a wrong . . . is insufficient after *Tangreti*[] to establish [] personal involvement."  Id. (citation omitted).

In his second amended complaint, plaintiff alleged that Barkman retaliated against him by placing him in the SHU, that Sullivan and Barkman treated him differently than other inmates by placing him with another inmate in a SHU cell, and that

Sullivan subjected him to unlawful conditions of confinement because of the COVID-19 pandemic.  See Sec. Am. Compl. at 11-12, 14.  Plaintiff's claims fail as a matter of law because there is no dispute that Barkman and Sullivan were not personally involved in the decision to place plaintiff in the SHU with another inmate.

The evidence in the record, including plaintiff's own testimony and assertions, indicate that Barkman did not make the decision to send plaintiff to the SHU and that neither defendant made the decision that plaintiff would share a cell with another inmate.  See Dkt. No. 125-1 at 12; Dkt. No. 124-1 at 57; Dkt. No. 119-5 at 3-5, ¶¶ 15, 19, 21; Dkt. No. 119-12 at 2-3, ¶¶ 4, 8-9; see also Colon v. Gunsett, No. 22-CV-635 (VB), 2023 WL 2139790, at *8 (S.D.N.Y. Feb. 21, 2023) ("[M]erely escorting an inmate is insufficient to establish personal involvement in a constitutional violation."); Douglas v. Annucci, No. 14-CV-6018 (CJS), 2022 WL 2306934, at *8 (W.D.N.Y. June 27, 2022) ("[The p]laintiff has not shown that any [] defendant was actually involved in the decision to transfer him to Elmira, or in the decision to require him to leave Elmira's protective custody area each day and walk through general population . . . .").

Plaintiff's testimony and assertions that Barkman and Sullivan did not correct other officers' orders are insufficient to establish defendants' personal involvement.  See Morrow, 2022 WL 526218, at *3; Colon, 2023 WL 2139790, at *8; Douglas, 2022 WL 2306934, at *8.  Accordingly, it is recommended that defendants' motion for summary judgment be granted, and plaintiff's motion be denied for lack of personal involvement. However, as plaintiff and defendants focus their motions on the merits of each of plaintiff's claims, the undersigned will address each in turn.

### B. First Amendment Retaliation Claim Against Barkman

In his unsworn second amended complaint, plaintiff alleged that after he was taken to the infirmary, he filled out an injury report stating that he "had a swelling to [his] head and a splitting head ache[.]"  Sec. Am. Compl. at 12.  Plaintiff alleged that Barkman was shown plaintiff's injury report and "within minutes" Barkman handcuffed plaintiff and took him to the SHU.  Id.  The other inmate involved in the fight was not taken to the SHU.  See id.

"To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action."  Hayes v. Dahlke, 976 F.3d 259, 272 (2d Cir. 2020) (citations omitted).  "Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'"  Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (citation omitted).

"'[O]ral complaints made to corrections officers' may serve as the basis for a First Amendment retaliation claim."  Zielinski v. Annucci, 547 F. Supp. 3d 227, 233 (N.D.N.Y. 2021) (citation omitted) (alteration in original).  "The same is true of formal grievances and lawsuits filed against prison officials."  Id.  Additionally, "requesting medical attention may be considered a protected activity."  Ruggiero v. Cnty. of Orange, No. 19-CV-3632 (VB), 2020 WL 5096032, at *6 (S.D.N.Y. Aug. 28, 2020).  "[W]hen faced with such a claim, district courts in the Second Circuit frequently assume, but do not decide,

that requests for medical attention are protected by the First Amendment for the purpose of analyzing the merits of a retaliation claim.'" Id. (quoting James v. Gage, 15-CV-106 (KMK), 2019 WL 6251364, at *6 (collecting cases) (citing Maxwell v. City of New York, 108 F. App'x 10, 12 (2d Cir. 2004) (summary order) (agreeing with district court's assumption that a "request medical attention can be considered a constitutionally protected statement")). But see Gilmore v. Blair, No. 9:18-CV-463 (GLS/DJS), 2020 WL 5792467, at *8 (N.D.N.Y. June 30, 2020) ("Courts have not recognized a freestanding right to request medical attention as a protected activity sufficient to support a retaliation claim."), report and recommendation adopted, No. 9:18CV463 (GLS/DJS), 2020 WL 5775203 (N.D.N.Y. Sept. 28, 2020).  Reasonable research has not revealed a case addressing whether filling out an injury report following an inmate-against-inmate fight constitutes protected activity.

As to the adverse action prong of a retaliation claim, "[a]n act in retaliation for the exercise of a constitutional right is actionable under [§] 1983 even if the act, when taken for different reasons, would have been proper." Franco v. Kelly, 854 F.2d 584, 590 (2d Cir. 1988) (citation omitted). "[R]etaliatory conduct must be the type that would deter 'a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" Hayes, 976 F.3d at 272 (citation omitted).  The Court "look[s] to the specific circumstances in which retaliation claims arise, 'bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse.'" Id. (citation omitted).  The Second Circuit has stated, "[i]n the prison context, the harm could include such an adverse action as placing a plaintiff in keeplock for a period of weeks." Gill v. Pidlypchak, 389 F.3d 379, 383 (2d Cir. 2004);

see also Smith v. Hash, No. 9:04-CV-0074 (LEK/DRH), 2006 WL 2806464, at *6
(N.D.N.Y. Sept. 28, 2006) ("It is reasonably possible that other inmates would fail to
exercise their constitutional right to file grievances for fear that they would be
transferred to SHU.  Thus, [the plaintiff's] alleged transfer to SHU in retaliation for filing
a grievance could be considered an adverse action."); Hamilton v. Fisher, No. 9:10-CV-
1066 (MAD/RFT), 2012 WL 987374, at *14 (N.D.N.Y. Feb. 29, 2012) (citation omitted)
("An 'alleged transfer to SHU . . . could be considered adverse action.'"), report and
recommendation adopted, 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012).

Defendants do not directly address whether plaintiff engaged in protected activity
by reporting or attempting to report any injuries while he was in the infirmary following
the April 12, 2020, fight.  See generally Dkt. No. 119-16.  Rather, defendants argue that
plaintiff has failed to "demonstrate a triable issue of fact that Defendant Barkman took
adverse action against him" and "there is no causal connection between the protected
activity (reporting injuries while at the infirmary) and the adverse action (Plaintiff sent to
the SHU)."  Id. at 17-18.

The Court need not determine whether plaintiff reporting his injuries constitutes
protected activity because there is no admissible record evidence demonstrating that
Barkman knew about plaintiff's report or decided to place plaintiff in the SHU in
retaliation for that report.  Barkman declares under the penalty of perjury that he did not
go to the infirmary with plaintiff, ever see plaintiff's injury report, or make the decision to
place plaintiff in the SHU.  See Dkt. No. 119-5 at 3, ¶¶ 12, 15.  Plaintiff testified that he
did not remember who took him to the infirmary, that there was no one else in the
infirmary besides the escorting officer and the nurse, and that Barkman never said

anything to him about his medical report or injuries.  See Dkt. No. 119-2 at 40-41, 43-44, 47, 52-53.  Rather, plaintiff states in his affidavit submitted in support of his motion for summary judgment that following the fight and being examined by medical staff, "Deputy Superintendent of Security 'Murphy' was notified.  And apparently overrided [sic] Barkman's decision to put me in a separate dorm but instead, ordered Def. Barkman to place me in the SHU."  Dkt. No. 124 at 18, ¶¶ 17-18.  Additionally, the misbehavior report authored by C.O. Mahar after the fight indicates that plaintiff was "moved at another housing unit" which was "authorized by Lt. Mahoney."  Dkt. No. 119-7.  Based on the foregoing, it is undisputed that Barkman did not take adverse action against plaintiff or that any such action was causally related to plaintiff's injury report.  Thus, plaintiff's retaliation claim fails as a matter of law, and it is recommended that defendants' motion for summary judgment be granted on this claim.

### C.  Eighth Amendment Conditions of Confinement Claim against Sullivan

"The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to 'adequate food, clothing, shelter, sanitation, medical care and personal safety.'"  Rasheen v. Adner, 356 F. Supp. 3d 222, 240 (N.D.N.Y. 2019) (quoting Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom. Bell v. Wolfish, 441 U.S. 520 (1979)).  "To demonstrate that the conditions of [one's] confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citation omitted).  The plaintiff "must allege that: (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the

defendant official acted with 'a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety.'" Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (quoting Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001)). "To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." Id. (citation omitted). "To meet the subjective element, the plaintiff must show that the defendant acted with 'more than mere negligence.'" Id. (citation omitted). "'[T]he prison official must know of, and disregard, an excessive risk to inmate health or safety.'" Id. (citation omitted). "Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." Id. (quoting Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003)).

"This Court has agreed with many 'other courts that an inmate can face a substantial risk of serious harm in prison from COVID-19 if a prison does not take adequate measures to counter the spread of the virus.'" Smith v. Miller, No. 9:20-CV-1435 (GTS/CFH), 2021 WL 6503602, at *11 (N.D.N.Y. Nov. 18, 2021) (citation omitted), report and recommendation adopted, 2022 WL 160312 (N.D.N.Y. Jan. 18, 2022); see also Fernandez-Rodriguez v. Licon-Vitale, 470 F. Supp. 3d 323, 351 (S.D.N.Y. 2020) (citations omitted) ("COVID-19 stands with the roster of infectious diseases from which 'correctional officials have an affirmative obligation to protect inmates.' . . . Inmates are particularly vulnerable to this disease. . . . Many courts have found that prisons exposed to the novel coronavirus present conditions that meet the objective prong of the constitutional analysis."). "The relevant inquiry is whether a [moving party] has shown a substantial risk of serious harm from COVID-19 at a correctional facility in light

29

of the countermeasures that the facility has in place."  Morales v. Brann, No. 1:20-CV-10126 (VEC/SDA), 2022 WL 18108561, at *4 (S.D.N.Y. Dec. 15, 2022) (citing Chunn v. Edge, 465 F. Supp. 3d 168, 201 (E.D.N.Y. 2020)), report and recommendation adopted, 2023 WL 35255 (S.D.N.Y. Jan. 4, 2023).

Research has not revelaed a case in which a court has concluded that the objective risk of harm prong was satisfied solely because the plaintiff was not able to social distance in a cell during the COVID-19 pandemic.  However, courts have concluded that there is sufficient evidence of a substantial risk of harm from COVID-19 when there is evidence of individuals in the prison testing positive for COVID-19, a failure to quarantine symptomatic or positive individuals, or the existence of a medical condition that increased the plaintiff's risk of harm from exposure.  See Chunn, 465 F. Supp. 3d at 201 (discussing the objective prong of an Eighth Amendment claim in the context of a preliminary injunction and explaining that courts that have found the objective prong to be likely satisfied "relied on evidence of elevated COVID-19 risks compared to the outside community[]"; "evidence that the jail 'currently has the highest rate of new coronavirus infections in the country[]'"; "undisputed data showing that 'the infection rate in [Department of Corrections] facilities was over seven times the infection rate of the District of Columbia at large[]'"; "the fact that it was 'undisputed that there is an active and serious outbreak of COVID-19' at the facility in question"; and "evidence of high infection rates[]"); Pierce v. Rodriguez, No. 3:20-CV-1755 (SVN), 2023 WL 2646825, at *8-9 (D. Conn. Mar. 27, 2023) (concluding that there was a dispute of material fact as to the objective prong because the plaintiff represented that inmate workers who moved through the prison were not being separated from nonworkers and

infected inmates were not being moved out of the cell block); Elliston v. Caron, No. 3:21-CV-1272 (JAM), 2022 WL 1471305, at *2 (D. Conn. May 10, 2022) (finding objective element satisfied because the plaintiff "alleges that he was forced to stay with infected inmates, without masks or cleaning supplies, as COVID-19 spread throughout the prisons."); Toussaint v. Guadarama, No. 3:21-CV-32 (MPS), 2021 WL 1648648, at *4 (D. Conn. Apr. 27, 2021) ("The plaintiff has plausibly alleged that the conditions that he endured . . . involving exposure to other inmates who had exhibited COVID-19 symptoms, posed a serious risk of harm to his health, particularly given his age and his underlying medical conditions, including diabetes[.]").

On the other hand, courts have concluded that there is insufficient evidence of a substantial risk of harm where the plaintiff only asserted general allegations of an increased risk from COVID-19 without specific instances of increased exposure, positive tests, or evidence of an underlying medical condition. See Shomo v. De't of Corr. & Cmty. Supervision, No. 21-CV-00128 (PMH), 2022 WL 1406726, at *12 (S.D.N.Y. May 4, 2022) (granting motion to dismiss for failure to state a claim because the "[p]laintiff has not, however, alleged that he was ever exposed to COVID-19, let alone that any such exposure resulted from [the d]efendants' 'deliberate indifference.'  [The p]laintiff does not allege how, when, where, or for how long he faced a risk of contracting COVID-19, or any facts specific to himself at all.  [The p]laintiff has only been housed at Fishkill since the onset of the COVID-19 pandemic.  However, he makes conclusory allegations about COVID-19 in 'every' DOCCS facility."); Burke v. Baker, No. 5:21-CV-265 (GWC/KJD), 2023 WL 1801927, at *10 (D. Vt. Feb. 7, 2023) (citations omitted) ("[The p]laintiff's Complaint [] does not plead sufficient facts to meet the objective

element of a deliberate-indifference claim. . . .  [The p]laintiff alleges that he tested

positive for COVID-19 in July 2020, but he speculates that his apparent exposure to the

virus resulted from off-duty conduct by facility staff. . . .  [The p]laintiff generally alleges

only that CoreCivic staff 'were/are . . . grossly negligent in that they all failed to require

other Vermont inmates to be vaccinated in close living conditions of confinement' and

that staff did not adequately separate vaccinated and unvaccinated inmates."), report

and recommendation adopted, 2023 WL 2423232 (D. Vt. Mar. 9, 2023); Braithwaite v.

Suffolk Cnty. New York, No. 22-CV-3750 (JS/AYS), 2022 WL 16837341, at *8 (E.D.N.Y.

Nov. 9, 2022) ("[The p]laintiff's allegations make clear that Suffolk County implemented

safety measures in response to the COVID-19 Pandemic.  Moreover, those measures

apparently protected [the p]laintiff from contracting the virus, as —by his own

allegations—he was exposed to the virus in the Jail on five occasions and, following a

period of quarantine, tested negative each time."), appeal docketed, No. 23-108 (2d.

Cir. Jan. 24, 2023); Harper v. Cuomo, No. 9:21-CV-0019 (LEK/ML), 2021 WL 1821362,

at *7 (N.D.N.Y. Mar. 1, 2021) (citations omitted) ("[The p]laintiffs have not shown a clear

likelihood of success in demonstrating that they face 'a substantial risk of serious harm'

based on the conditions at Adirondack, given the measures that prison officials have

instituted to address COVID-19 and the low COVID-19 positivity rate that those

measures have attained at Adirondack."), report and recommendation adopted, 2021

WL 1540483 (N.D.N.Y. Apr. 20, 2021).

   Here, there is insufficient record evidence to create a dispute of material fact as

to whether plaintiff faced a substantial risk of serious harm.  First, DOCCS put into place

countermeasures in response to COVID-19; it instructed that double bunking be

minimized or eliminated, where possible, and that internal facility moved be suspended "absent exigent circumstances or upon the completion of a disciplinary confinement sanction." Dkt. No. 119-3. During his disciplinary hearing and in his response to defendants' motion for summary judgment, plaintiff acknowledged that the SHU was a double bunk facility. See Dkt. No. 119-14 at 3; see also Dkt. No. 124 at 49, n.22. Second, while in the SHU, plaintiff was often housed in a cell by himself. See Dkt. No. 119-2 at 57-58, 60-62, 66-67. Defendants do not proffer an explanation as to why plaintiff was moved from a cell by himself to a cell with another inmate amidst the COVID-19 pandemic. See generally Dkt. No. 119-16. However, when he was moved into a cell with another inmate, he was given a mask and instructed to wear it. See Dkt. No. 119-2 at 157-59. Third, and most importantly, there is no record evidence that the other inmates plaintiff was required to bunk with were ever sick, that plaintiff or the other inmates refused to wear their masks, that inmates housed in the SHU or elsewhere were symptomatic or testing positive at the time plaintiff was required to double bunk, or that Greene C.F. was failing to quarantine positive or symptomatic individuals.

Plaintiff attaches to his motion for summary judgment two pages of information which indicate that "[a]s of December 17, 2021, DOCCS has reported 7,882 positive tests among incarcerated people since the beginning of the pandemic. . . . 37 people who are incarcerated and 15 staff members have died due to Covid-19." Dkt. No. 124-2 at 83.[7] A chart, which does not include headings, contains statistics from April 2021 to November 2021. See id.

---

[7] At the top of the first page, plaintiff writes what could possibly be the author of the information: the Parole Preparation Project. See Dkt. No. 124-2 at 83.

First, the chart and statistics do not say anything about May of 2020, which is when plaintiff was forced to double bunk. See Dkt. No. 124-2 at 83. Second, the information does not pertain specifically to Greene C.F., but discusses DOCCS facilities in general. See id. As such, it is not evidence sufficient to create a dispute of material fact as to the conditions plaintiff endured.

Next, plaintiff testified in his deposition that he took "[h]igh blood pressure pills." Dkt. No. 119-2 at 11. However, there are no allegations or evidence concerning when plaintiff started taking the medication, how it affected him, or whether he was at an increased risk of harm from COVID-19 because of any medical condition. Plaintiff also testified that in June of 2021, he tested positive for Tuberculosis. See Dkt. No. 119-2 at 147; see also Dkt. No. 124-2 at 55. There is no evidence in the record to indicate that plaintiff had Tuberculosis during the two weeks he was double bunked in the SHU that would have placed him at an increased risk of serious illness had he contracted COVID-19; rather, plaintiff tested negative for tuberculosis in July 2020. See Dkt. No. 124-2 at 58; see also  Brown v. City of New York, No. 21-CV-4632 (PGG/SLC), 2023 WL 2908661, at *10 (S.D.N.Y. Jan. 30, 2023) (citation omitted) (explaining that the plaintiff's "medical records . . . do not show any symptoms nor diagnosis of asthma, and therefore, 'he has not shown [that] he has a condition or conditions that put him at increased risk of serious illness should he be infected[.]'"), report and recommendation adopted, 2023 WL 2496089 (S.D.N.Y. Mar. 14, 2023).

Finally, plaintiff stated in his affidavit in support of his motion for summary judgment, that in the cell that he shared with another inmate, "the vents were so clogged it looked like maggots was in them, window was broken[,] and the lights never

34

worked." Dkt. No. 124 at 31, n.31; <u>see also</u> Dkt. No. 124-1 at 25-26. Plaintiff testified

that the cell was "sloppy," "the vents are cut off, and the lights are always off." Dkt. No.

119-2 at 76. Plaintiff did not state these allegations in his second amended complaint

and defendants did not address these assertions in their response to plaintiff's motion.

<u>See generally</u> Sec. Am. Compl.; Dkt. No. 129.

        "The Second Circuit has held that poor air quality in a facility for a prolonged

period can be an unconstitutional condition of confinement." <u>McTerrell v. Koenigsmann</u>,

No. 1:18-CV-01028 (EAW), 2019 WL 2511426, at *12 (W.D.N.Y. June 18, 2019) (citing

<u>Benjamin v. Fraser</u>, 343 F.3d 35, 52 (2d Cir. 2003) (holding "the presence of large

numbers of inoperable windows, clogged or dirty ventilation registers and exhaust vents

in showers and cells, and poor air quality" was a violation of the plaintiffs' constitutional

rights), <u>overruled on other grounds by</u> <u>Caiozzo v. Koreman</u>, 581 F.3d 63, 71 (2d Cir.

2009)). "However, '[w]here the exposure is for a short period of time, courts have found

no Eighth Amendment violation.'" <u>Id.</u> (quoting <u>Clay v. Lee</u>, No. 13-CV-7662 (KMK),

2019 WL 1284290, at *6 (S.D.N.Y. Mar. 20, 2019) (collecting cases)). Whether

unsanitary conditions constitute "cruel and unusual depends on both the duration and

the severity of the exposure." <u>Willey v. Kirkpatrick</u>, 801 F.3d 51, 68 (2d Cir. 2015).

        Courts have dismissed claims concerning unsanitary conditions when a plaintiff

has alleged only general statements concerning the severity and/or duration of the

alleged conditions. <u>See</u> <u>Hamilton v. Westchester Cnty.</u>, No. 18-CV-8361 (NSR), 2020

WL 917214, at *7 (S.D.N.Y. Feb. 25, 2020) ("[The p]laintiff's complaints of poor

ventilation resulting in unbearable heat, difficulty breathing, and rust dripping in his cell,

in combination, are troubling. . . . Without any additional information as to the duration

of the conditions [the p]laintiff alleges, the Court cannot determine that they pose an objectively unreasonable risk to [the p]laintiff's health."), aff'd in part, vacated in part, remanded, 3 F.4th 86 (2d Cir. 2021); Baltas v. Magia, et al., No. 3:20-CV-1177 (MPS), 2021 WL 2206966, at *11 (D. Conn. June 1, 2021) (dismissing conditions of confinement claim because the plaintiff "provides no factual substantiation for his assertion that his deprivation based on poor ventilation is exacerbated by the COVID-19 pandemic; and he provides no facts indicating that he is likely to contract COVID-19 due to the use of the recycled air system."); Figueroa v. Cnty. of Rockland, No. 16-CV-6519 (NSR), 2018 WL 3315735, at *7 (S.D.N.Y. July 5, 2018) (dismissing the claim although the plaintiff alleged that he was in intake housing for ninety days and while there, experienced bite marks, there was no ventilation, feces was being thrown; but "this Court cannot ascertain whether [the p]laintiff was in the same cell with [the inmate throwing feces] while he was throwing his feces (as there are 16 cells in intake housing) or how often he would do so, whether the cleaning supplies were cleaned after they were used to clean up [the feces], and the amount of time [the p]laintiff was exposed to the conditions in the bathroom shower."); Jackson v. Sullivan Cnty., No. 16-CV-3673 (JCM), 2018 WL 1582506, at *4 (S.D.N.Y. Mar. 27, 2018) ("The presence of mold in a shower for a limited duration, without more, does not violate contemporary standards of decency or establish an objectively unreasonable risk of serious damage to future health or safety."). But see Walker v. Schult, 717 F.3d 119, 126 (2d Cir. 2013) (concluding that the plaintiff plausibly alleged as Eighth Amendment violation because "[h]e alleged that for approximately twenty-eight months, he was confined in a cell with five other men, with inadequate space and ventilation, stifling heat in the summer and

freezing cold in the winter, unsanitary conditions, including urine and feces splattered on the floor, insufficient cleaning supplies, a mattress too narrow for him to lie on flat, and noisy, crowded conditions that made sleep difficult and placed him at constant risk of violence and serious harm from cellmates.").

Plaintiff did not allege the unsanitary conditions in his second amended complaint and even if he had, such allegations are conclusory as to the severity of the conditions and are insufficient to create a dispute of material fact. See Sec. Am. Compl. Undoubtedly, "[t]t is . . . by now common knowledge—that COVID-19 is a highly dangerous disease that poses a significant risk of severe illness and death, particularly for" those with underlying chronic health conditions. Martinez-Brooks v. Easter, 459 F. Supp. 3d 411, 440 (D. Conn. 2020). However, plaintiff does not allege why he was on high blood pressure medication, when he started taking medication, that any condition placed him at increased risk of harm from COVID-19, or that he had Tuberculosis at the time he was required to share a cell with another inmate. See generally Sec. Am. Compl. Although plaintiff was required to share a cell with another inmate and was unable to maintain six-feet of social distance at all times, he was provided with a face mask and instructed to wear it, there is no evidence that he or the other inmate were symptomatic or exposed to COVID-19, and there is no evidence that there was an increase in positive cases that the prison was failing to quarantine. See Dkt. No. 119-2 at 74-7, 76-77. Additionally, plaintiff does not allege, nor is there evidence in the record that indicates that the clogged vent created an unreasonable risk to plaintiff's health. As such, plaintiff has failed to satisfy the objective prong of a conditions of confinement claim.

Even if the District Court Judge were to disagree as to the objective prong,

summary judgment in favor of defendant Sullivan is warranted because plaintiff has

failed to satisfy the subjective prong of a conditions of confinement claim.  To satisfy the

subjective prong, plaintiff must show that Sullivan "acted intentionally to impose the

alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that

the condition posed to the [plaintiff] even though the defendant[ ] knew, or should have

known, that the condition posed an excessive risk to health or safety.'" Smith, 2021 WL

6503602, at *11 (citations omitted).

There is no admissible evidence in the record demonstrating that Sullivan knew

anything beyond the fact that plaintiff was sharing a cell with another inmate as of the

May 13, 2020, hearing.  See Dkt. No. 119-14 at 3.  For example, there is no evidence

that Sullivan knew whether (1) plaintiff had underlying health conditions that made him

more vulnerable to COVID-19, (2) plaintiff was instructed to and was wearing his mask

while in the cell, (3) there were empty cells plaintiff could have been moved to, (4) there

was an increase in the number of positive cases of COVID-19, (5) the prison was

appropriately quarantining symptomatic or positive individuals, or (6) the vent in

plaintiff's cell was clogged or dirty.  Without evidence of any such knowledge, plaintiff

has failed to establish a dispute of material fact as to whether Sullivan disregarded an

excessive risk to plaintiff's health.  See Pierce, 2023 WL 2646825, at *10 ("[The p]laintiff

has proffered evidence from which a reasonable jury could find that [the d]efendants

knew there were inmates with COVID-19 in B-Block and disregarded the associated risk

when they transferred him there."); Nazario v. Thibeault, No. 3:21-CV-216 (VLB), 2022

WL 2358504, at *6 (D. Conn. June 30, 2022) ("[The p]laintiff has alleged sufficient facts

that his exposure to COVID-19 resulted from [the d]efendant's deliberate indifference to survive summary judgment. . . .  [The p]laintiff specifically contends that, despite Osborn's quarantine protocols, [the d]efendant was aware that [the p]laintiff and the other laundry workers were moved into a housing unit with COVID-19 positive and/or symptomatic inmates.  He also asserts that [the d]efendant did not provide the laundry workers with proper PPE to safely perform their duties."); Toussaint, 2021 WL 1648648, at *4 (concluding that the plaintiff had sufficiently alleged a deliberate indifference claim because the plaintiff alleged that the defendants knew inmates were symptomatic or positive for COVID-19 and that the plaintiff was older and had diabetes but refused to transfer the plaintiff from the block).  As there is no evidence in the record that Sullivan knew of a substantial risk to plaintiff's health and disregarded that risk, it is recommended that defendants' motion for summary judgment be granted, and plaintiff's Eighth Amendment claim against defendant Sullivan be dismissed.

### D.  Fourteenth Amendment Equal Protection Claims against Barkman and Sullivan

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  "Essential to that protection is the guarantee that similarly situated persons be treated equally."  Rasheen v. Adner, 356 F. Supp. 3d 222, 242 (N.D.N.Y. 2019).  "In order to establish an equal protection violation, the plaintiff[] must show that [he or she was] treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination."  Id. (citation omitted).  "[A] valid equal protection claim may

be brought by a 'class of one,' 'where the plaintiff alleges that [he or] she [] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Id. (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)); see also Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (citation and emphasis omitted) (explaining that the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"). "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006).

Plaintiff alleges that he was treated differently than the other inmate that he fought with on April 12, 2020, because he was taken to the SHU and the other inmate was not. See Sec. Am. Compl. at 12. In his declaration in support of his opposition to defendants' motion, he refers to himself as a "class of one" plaintiff. Dkt. No. 125-3 at 2, ¶ 3. In his motion for summary judgment, plaintiff states that "the General Population inmate[s] were not placed in double bunks[] while forcing SHU inmates to double bunk." Dkt. No. 124 at 58; see also Dkt. No. 125-1 at 11.

First, plaintiff has not asserted that he was discriminated against on the basis of a being a member of a constitutionally protected class. Second, plaintiff has not produced admissible evidence supportive of a class of one theory—"that he was treated differently than others similarly situated as a result of intentional or purposeful

discrimination[]" and "that the difference in treatment was not reasonably related to any 'legitimate penological interests.'" Reynolds v. Quiros, 990 F.3d 286, 300 (2d Cir. 2021) (quoting Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005)).

Inmates in the general population are not similarly situated to inmates housed in the SHU. See Stevens v. Cuomo, No. 9:21-CV-0306 (GLS/ML), 2021 WL 3165364, at *8 (N.D.N.Y. July 27, 2021) ("[G]eneral population inmates are not similarly situated to SHU inmates."), appeal dismissed, No. 21-2093, 2022 WL 3703317 (2d Cir. Feb. 28, 2022). Further, insofar as plaintiff was transported to the SHU by Barkman following the April 12, 2020, fight, and the other inmate was not, the record demonstrates that plaintiff was the aggressor in the fight (an accusation to which he pleaded guilty at the disciplinary hearing). See Dkt. Nos. 119-7, 119-8, 119-9; see also Gomez v. Chill, No. 11-CV-6844 (CM/JLC), 2015 WL 1853110, at *12 (S.D.N.Y. Apr. 17, 2015) (comparing Salahuddin v. Jones, 992 F.2d 447, 449 (2d Cir. 1993) (per curiam) (finding legitimate penological interest where the plaintiff was in the SHU for fighting another inmate), with Salahuddin v. Goord, 467 F.3d 263, 276-77 (2d Cir. 2006) (denying summary judgment where "[t]he defendants do argue that denying [the plaintiff] the ability to observe these religious rites was reasonable in light of their legitimate penological—interest a compelling interest—in protecting inmate safety. After all, the defendants point out, [the plaintiff] was put in disciplinary keeplock for conspiring to assault another inmate who was also a member of the Muslim community at Woodbourne.")), report and recommendation adopted, 2015 WL 3862709 (S.D.N.Y. June 9, 2015).

Plaintiff has not produced any evidence to support the contention that he was transferred to the SHU because of an intent to discriminate on the basis of

impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.  See Hamilton v. New York State Dep't of Corr. & Cmty. Supervision, No. 9:18-CV-1312 (MAD/CFH), 2021 WL 5095962, at *17 (N.D.N.Y. Aug. 18, 2021) (citation omitted) ("[A] aside from [the p]laintiff's conclusory assertion made in opposition that defendants 'purposefully act[ed] with malice,' the record is bereft of any evidence that supports [the] plaintiff's speculative assertion that inmates of other religions were placed on call-out lists."), report and recommendation adopted sub nom. Hamilton v. Annucci, 2021 WL 4316747 (N.D.N.Y. Sept. 23, 2021).

Similarly, as to Sullivan, there is no evidence that Sullivan selectively treated plaintiff different than any other SHU inmate.  See Ruggiero v. Fischer, 807 F. App'x 70, 74 (2d Cir. 2020) (summary order) (affirming grant of summary judgment because the plaintiff "made no showing at all that he was treated differently from SHU inmates at other institutions[]" and "did not attempt to identify a specific comparator at Southport or another facility with whom he had a high degree of similarity.").  Plaintiff testified that while he was in the SHU, he was required to bunk with another inmate once for a few minutes to a couple of hours, and then for a couple of weeks.  See Dkt. No. 119-2 at 58-61, 73-74, 76-77.  Sullivan did not decide for plaintiff to be double bunked when other SHU inmates were not double bunked.  In fact, the other inmates that plaintiff shared a cell with, were also double bunked.  See Dkt. No. 119-2 at 58-61, 73-74, 76-77.  Plaintiff has not presented any evidence that Sullivan's actions were done with an intent to discriminate against plaintiff on the basis of impermissible considerations.  See Shakur v. Sieminski, No. 3:07-CV-1239C, 2009 WL 2151174, at *8 (D. Conn. July 15, 2009)

(determining that the plaintiff "presents no evidence showing racial discrimination, intent to inhibit his exercise of any constitutional right or any malicious intent to injure. . . . [The plaintiff] has identified and presented evidence of no other inmates with similar disciplinary history who were treated differently under the same circumstances.").

To the extent plaintiff states that Sullivan and Barkman were a part of a conspiracy and acted with malice or ill intent, there is no admissible record evidence to indicate that either defendant acted maliciously or in any way other than by following orders to transfer plaintiff to the SHU and by sanctioning him for misbehavior. See Dkt. No. 125-1 at 12, 21-24. Based on the foregoing, plaintiff's Equal Protection claims fail as a matter of law. It is recommended that defendants' motion for summary judgment as to plaintiff's Equal Protection claims be granted and those claims be dismissed.

### E. State Law Tort Claim

As the undersigned recommends granting defendants' summary judgment motion on the federal claims, the undersigned also recommends granting defendants' motion for summary judgment on plaintiff's related state law tort claim.

28 U.S.C. § 1367(c)(3) instructs that "the district courts may decline to exercise supplemental jurisdiction over a [state-law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3). "The decision is a discretionary one, and its justification 'lies in considerations of judicial economy, convenience[,] and fairness to litigants[.]'" Allen v. Cnty. of Cayuga, No. 9:17-CV-0018 (MAD/TWD), 2018 WL 11469532, at *14 (N.D.N.Y. June 25, 2018) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)), report and recommendation adopted, 2018 WL 11469516 (N.D.N.Y. Aug. 13, 2018). However, "[t]he Second Circuit

has instructed 'if [all] federal claims are dismissed before trial . . . the state claims should be dismissed as well.'" Id. (quoting Castellano v. Bd. of Tr., 937 F.2d 752, 758 (2d Cir. 1991)).

As the undersigned recommends dismissing all of plaintiff's federal claims, it is also recommended that the Court decline to exercise supplemental jurisdiction over plaintiff's state law tort claim. See MacInerney v. Allen, No. 5:21-CV-0818 (LEK/ML), 2022 WL 561649, at *4 (N.D.N.Y. Feb. 24, 2022) ("Having found that all of [the p]laintiff's federal claims are subject to dismissal, I recommend that, to the extent that [the p]laintiff has asserted any state law claims, the Court decline to exercise jurisdiction over those claims."), report and recommendation adopted, 2022 WL 1025841 (N.D.N.Y. Apr. 6, 2022).

## F.  Qualified Immunity

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995). A correction officer is "entitled to qualified immunity from civil liability for actions performed in the course of their duties insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Whitley v. Miller, 57 F. Supp. 3d 152, 162 (N.D.N.Y. 2014) (citations and quotation marks omitted); see also Hartline v. Gallo, 546 F.3d 95, 102 (2d Cir. 2008). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning

qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001), receded on other grounds by Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Here, the Court need not address qualified immunity as an alternative ground to defendants' summary judgment motion because plaintiff has not established a dispute of material fact as to whether defendants violated his constitutional rights. See Warren v. Corcoran, No. 9:09-CV-1146 (DNH/ATB), 2011 WL 5599587, at *8 (N.D.N.Y. Oct. 20, 2011) ("This court need not address qualified immunity with respect to [the] plaintiff's various causes of action because . . . he has not established any alleged violations of his constitutional rights."), report and recommendation adopted, 2011 WL 5599620 (N.D.N.Y. Nov. 17, 2011); Atkinson v. Huntington, No. 9:15-CV-0065 (MAD/TWD), 2016 WL 8735651, at *10, n.15 (N.D.N.Y. Aug. 19, 2016) ("In light of my recommendations that [the d]efendants' motion be granted in its entirety based on the merits, I find it unnecessary to address [the d]efendants' alternative qualified immunity arguments."), report and recommendation adopted, 2016 WL 4991616 (N.D.N.Y. Sept. 19, 2016).

## V. Conclusion

**WHEREFORE**, based on the foregoing, it is hereby:

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 119) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's motion for summary judgment (Dkt. No. 124) be **DENIED**; and it is further

**RECOMMENDED**, that plaintiff's second amended complaint (Dkt. No. 50) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.[8]

Dated: May 3, 2023
      Albany, New York

*Christian F. Hummel*

Christian F. Hummel
U.S. Magistrate Judge

---

[8] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. See FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. See id. § 6(a)(1)(C).